# STATE OF MICHIGAN

# COURT OF APPEALS

In re E. M. ENGLAND, Minor.

FOR PUBLICATION
January 28, 2016
9:05 a.m.

No. 327240
Washtenaw Circuit Court
Family Division
LC No. 13-000190-NA

Before: SHAPIRO, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to the minor child, E.M., at the initial disposition under MCL 712A.19b(3)(b)(*i*) (parent caused physical abuse and reasonable likelihood that child will suffer from injury or abuse in the future if returned to the parent), (j) (reasonable likelihood that child will be harmed if returned to the parent), and (k)(*iii*) (parent abused the child and abuse included battering, torture, or other severe physical abuse). For the reasons set forth in this opinion, we affirm.

## A. FACTS AND PROCEDURAL HISTORY

These proceedings stem from an investigation of child abuse that took place after the child, E.M., then approximately two months old, was brought by his parents to the Mott Children's Hospital at the University of Michigan on Sunday, December 15, 2013, with concerns of a "popping sensation" on the left side of his ribs. X-rays ultimately revealed that E.M. had two acute fractures in the seventh and eighth ribs on the left posterior side of his body, as well as several other, potentially older, fractures in the fourth, fifth, and sixth ribs on his right and left sides. X-rays also showed that E.M. had a fracture in his right tibia, which was definitely older than the rib fractures and already healing. Finally, E.M. was observed to have a bruise on his chest. Dr. Bethany Mohr, a pediatric hospitalist and director of the child protection team at Mott Children's Hospital, opined that, given the various stages of healing, the injuries showed there were "at least two incidents" in which E.M. was harmed. In her opinion, the fractures were "diagnostic of abuse" and the bruise was "also highly suspicious, if not diagnostic of abuse."

Respondent was interviewed at the hospital by Dr. Mohr. He initially indicated that he did not know how E.M. could have been injured, but subsequently acknowledged two previous occasions, including one on December 14, 2013, in which he had fallen while carrying E.M. in his car seat. Respondent clarified to Dr. Mohr, however, that the child was not injured in either of these falls because he never fell out of his car seat. Respondent was also interviewed by Child

-1-

Protective Services (CPS) specialist Rita Sharma and Washtenaw County Sheriff's Detective Craig Raisanen. As in his first interview, respondent initially told Sharma and Raisanen that he did not know how E.M. was injured. Subsequently, however, he admitted being responsible for the child's rib and leg fractures. Specifically, as to the leg fracture, respondent indicated that he lifted E.M. up by both of his legs while changing his diaper on December 11, 2013, and that in doing so he had used enough force to possibly cause the injury. As to the rib injuries, respondent told Sharma and Raisanen about his fall on December 14, 2013, while he was carrying E.M. As in his first interview, respondent clarified that E.M. was not injured when he fell. However, in falling, respondent injured his back. Subsequently, when he attempted to remove the child from the car seat, he felt a sharp pain in his back, causing him to squeeze E.M. in the torso area with both hands, possibly causing the rib injuries. Respondent acknowledged that on both occasions he recognized that E.M. may have been injured, but he did not seek medical attention or inform E.M.'s mother.

Respondent was eventually charged with two counts of second-degree child abuse. He pleaded guilty to one count and was sentenced to two years' probation. At the same time, the Department of Health and Human Services (DHHS) petitioned the trial court to terminate respondent's parental rights. After a two-day combined adjudication trial and termination hearing, the trial court granted that request. Respondent now appeals as of right.

## B. GOVERNING LAW

At the outset, we note that there is no dispute that E.M. is eligible for membership in the Sault Ste. Marie Tribe of Chippewa Indians (the Tribe) and is thus an Indian child, such that the various procedural and substantive provisions of the Indian Child Welfare Act (ICWA), 25 USC § 1901 *et seq.*, and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq.*, applied to these proceedings. See 25 USC § 1903(4); MCL 712B.3(k). To facilitate our analysis, we provide the following brief overview of both acts.

"In 1978, Congress enacted [the] ICWA in response to growing concerns over 'abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.'" *In re Morris*, 491 Mich 81, 97-98; 815 NW2d 62 (2012), quoting *Mississippi Band of Choctaw Indians v Holyfield*, 490 US 30, 32; 109 S Ct 1597; 104 L Ed 2d 29 (1989). The stated purpose of the ICWA is to protect and preserve Indian families, tribes, and tribal culture. *Id*.

More recently, in January 2013, the Michigan Legislature enacted the MIFPA "with the purpose of protecting 'the best interests of Indian children and promot[ing] the stability and security of Indian tribes and families.'" *In re Spears*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 320584, issued March 19, 2015); slip op at 6, quoting MCL 712B.5(a). The ICWA

and the MIFPA each establish various substantive and procedural protections where an Indian child[1] is involved in a child protective proceeding.

Relevant to this appeal, the ICWA sets forth the following substantive provisions for child protective proceedings involving an Indian child:

(d) Remedial services and rehabilitative programs; preventive measures.

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

(e) Foster care placement orders; evidence; determination of damage to child.

No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

(f) Parental rights termination orders; evidence; determination of damage to child.

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. [25 USC § 1912.]

Similarly, in relevant part, the MIFPA sets forth the following requirements:

(2) An Indian child may be removed from a parent or Indian custodian, placed into a foster care placement, or, for an Indian child already taken into protective custody, remain removed from a parent or Indian custodian pending further proceedings, only upon clear and convincing evidence, that includes testimony of at least 1 expert witness who has knowledge of child rearing practices of the Indian child's tribe, that active efforts have been made to provide remedial

---

[1] Under the ICWA, an "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 USC § 1903(4). The MIFPA more broadly defines "Indian child" to include a child "[e]ligible for membership in an Indian tribe as determined by that Indian tribe," without reference to whether the parent is a tribal member, MCL 712B.3(k)(*ii*). See *In re KMN*, 309 Mich App 274, 287; 870 NW2d 75 (2015).

-3-

services and rehabilitative programs designed to prevent the breakup of the Indian family, that the active efforts were unsuccessful, and that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child . . . .

(3) A party seeking a termination of parental rights to an Indian child under state law must demonstrate to the court's satisfaction that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the active efforts were unsuccessful.

(4) No termination of parental rights may be ordered in a proceeding described in this section without a determination, supported by evidence beyond a reasonable doubt, including testimony of at least 1 qualified expert witness . . . that the continued custody of the child by the parent or Indian custodial is likely to result in serious emotional or physical damage to the child.  [MCL 712B.15.]

As the plain language of the above provisions make clear, 25 USC § 1912(e) and MCL 712B.15(2) pertain to removal decisions, while 25 USC § 1912(d) and (f) and MCL 712B.15(3) and (4) pertain to termination decisions.  Because this case did not involve the removal of E.M. from the parental home, but instead involved the termination of respondent's parental rights, the latter provisions govern the outcome of this appeal.

Stated succinctly, in proceedings involving termination, the ICWA and the MIFPA "require a dual burden of proof."  *In re Payne/Pumphrey/Fortson*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 324813, issued June 11, 2015); slip op at 4 (citation omitted).  "That is, in addition to finding that at least one state statutory ground for termination was proven by clear and convincing evidence, the trial court must also make findings in compliance with [the] ICWA [and the MIFPA] before terminating parental rights."  *Id.*; slip op at 4.

The specific findings required by the ICWA and the MIFPA in termination proceedings are: (1) proof that active efforts were made to reunify the family, 25 USC § 1912(d); MCL 712B.15(3); MCR 3.977(G)(1); and (2) proof beyond a reasonable doubt that the continued custody of the child by the parent would likely result in serious emotional or physical damage to the child, 25 USC § 1912(f); MCL 712B.15(4); MCR 3.977(G)(2).

Finally, as in all termination proceedings, the trial court has a duty to determine, by a preponderance of the evidence, "that termination is in the child's best interests before it can terminate parental rights."  *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012).  The clearly erroneous standard of review applies to each of these findings.  MCR 3.977(K); *In re SD*, 236 Mich App 240, 245-246; 599 NW2d 772 (1999).  "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed[.]"  *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013).

We proceed by determining whether the trial court properly applied the dual-burden of proof required under this statutory framework.

C. ANALYSIS

-4-

## I. STATUTORY GROUNDS/BEST INTERESTS

Respondent does not challenge the trial court's findings that a statutory ground for termination was proved or that termination was in E.M.'s best interests. Nevertheless, because the court's findings in these respects are inextricably linked to its findings under the ICWA and the MIFPA, we have reviewed the record and conclude that the trial court did not clearly err in finding statutory grounds for termination and that the termination was in E.M.'s best interests.

As noted above, respondent pleaded guilty to second-degree child abuse after he admitted causing E.M.'s various rib and leg fractures and then failing to seek medical care or report those injuries in a timely manner. There was thus abundant evidence that respondent caused serious physical harm to E.M. Moreover, there was clear and convincing evidence that the child would suffer additional injury or abuse in the future if returned to respondent's care. In sum, despite his guilty plea, the evidence established that respondent failed to take responsibility for his actions and instead blamed others for E.M.'s injuries—including the child's mother and a babysitter—months after entering his guilty plea. He also failed to follow through with counseling services that would help him address his issues, and Dr. Joshua Ehrlich, the clinical psychologist who performed respondent's psychological evaluation, opined at the termination hearing that respondent was dangerous, at high risk for reoffending, and should not be around children. Likewise, Sharma and Stacey O'Neill, a member of and caseworker for the Tribe, opined that respondent presented a substantial risk to E.M. in light of his failure to take responsibility and his failure to adequately participate in services. Termination was thus appropriate under MCL 712A.19b(3)(b)(*i*), (j) and (k)(*iii*). Moreover, in light of this evidence, termination was also in E.M.'s best interests. *In re Olive/Metts*, 297 Mich App at 40.

## II. CONSTITUTIONALITY OF MCL 712B.15(3)

Respondent argues that MCL 712B.15(3) is unconstitutionally vague because it does not provide an evidentiary standard by which the trial court must make its factual findings.

Constitutional issues and issues of statutory construction involve questions of law that we review de novo. *Federal Home Loan Mortgage Ass'n v Kelley (On Reconsideration)*, 306 Mich App 487, 493; 858 NW2d 69 (2014). "The primary goal of statutory interpretation is to give effect to the Legislature's intent, focusing first on the statute's plain language." *Klooster v City of Charlevoix*, 488 Mich 289, 296; 795 NW2d 578 (2011). "[U]nless explicitly defined in a statute, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used." *Yudashkin v Holden*, 247 Mich App 642, 650; 637 NW2d 257 (2001) (quotation marks and citation omitted). Moreover, "under established rules of statutory construction, statutes are presumed constitutional, and courts have a duty to construe a statute as constitutional unless unconstitutionality is clearly apparent." *In re Gosnell*, 234 Mich App at 326, 334; 594 NW2d 90 (1999) (internal quotations and citation omitted).

As noted above, MCL 712B.15 provides heightened evidentiary requirements in child protective proceedings involving Indian children. Specifically, MCL 712B.15(2) provides that an Indian child may not be removed from the home or placed into foster care absent "clear and convincing evidence" that active efforts were made to provide the family with services, that

those efforts were unsuccessful, and that the child is likely to be harmed if not removed. Similarly, with respect to termination, MCL 712B.15(4) provides that parental rights may not be terminated absent evidence to establish, "beyond a reasonable doubt," that the parent's continued custody of the child would likely result in serious physical or emotional harm to the child. Finally, MCL 712B.15(3), the provision specifically challenged by respondent, provides:

> A party seeking a termination of parental rights to an Indian child under state law must demonstrate *to the court's satisfaction* that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the active efforts were unsuccessful. [Emphasis added.]

A statute is void for vagueness if "'(1) it is overbroad and impinges on First Amendment Freedoms, (2) it does not provide fair notice of the conduct it regulates, or (3) it gives the trier of fact unstructured and unlimited discretion in determining whether the statute has been violated.'" *Kenefick v Battle Creek*, 284 Mich App 653, 655; 774 NW2d 925 (2009), quoting *Proctor v White Lake Twp Police Dep't*, 248 Mich App 457, 467; 639 NW2d 332 (2001). In this case, respondent argues that MCL 712B.15(3) is unconstitutionally vague because, unlike MCL 712b.15(2) and (4), which clearly set forth an applicable standard of proof, the former section does not provide any standard of proof. Essentially, respondent argues that MCL 712B.15(3) is unconstitutionally vague in that it provides the trial court with unfettered discretion to determine whether "active efforts" were made.

We are unaware of any published caselaw addressing the applicable burden of proof under MCL 712B.15(3). However, both this Court and our Supreme Court have addressed an identical issue in the context of the analogous "active efforts" provision of the ICWA, 25 USC § 1912(d). That statutory provision provides as follows:

> [a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall *satisfy the court* that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. [25 USC § 1912(d) (emphasis added).]

In *In re Roe*, 281 Mich App 88, 99-101; 764 NW2d 789 (2008), this Court was tasked with determining what standard of proof applied to the "active efforts" requirement in 25 USC § 1912(d). In resolving the issue, this Court found particularly persuasive the Nebraska Supreme Court's decision in *In re Walter W*, 274 Neb 859; 744 NW2d 55 (2008), in which that Court reasoned:

> . . . Congress imposed a 'beyond a reasonable doubt' standard for the 'serious emotional [or] physical damage' element in parental rights termination cases under § 1912(f). Congress also imposed a 'clear and convincing' standard of proof for the 'serious emotional or physical damage' element in foster care placements under § 1912(e). The specified standards of proof in subsections § 1912(e) and (f) illustrate that if Congress had intended to impose a heightened standard of proof for the active efforts element in § 1912(d), it would have done

so. [*In re Roe*, 281 Mich App at 100, quoting *In re Walter W*, 274 Neb at 864-865.]

Relying on the Nebraska Supreme Court's reasoning, the *Roe* Court held that Congress intentionally chose not to impose a particular standard for 25 USC § 1912(d), and therefore "the proper standard of proof for determinations under § 1912(d) of the ICWA is the default standard applicable to all Michigan cases involving the termination of parental rights. That standard is proof by clear and convincing evidence." *In re Roe*, 281 Mich App at 100-101.

Our Supreme Court ultimately adopted *Roe's* holding in *In re JL*, 483 Mich 300, 326-327; 770 NW2d 853 (2009). In that case, the Court noted that "[b]ecause Congress did not provide a heightened standard of proof in 25 USC 1912(d), as it did in 25 USC 1912(f), the default standard of proof for termination of parental rights cases, clear and convincing evidence, applies to the determination whether the DHS provided 'active efforts . . . to prevent the breakup of the Indian family' under 25 USC 1912(d)." *In re JL*, 483 Mich at 318-319, citing *In re Roe*, 281 Mich App at 100-101.[2]

As the above authority illustrates, in the face of Congress' failure to articulate a standard of proof in 25 USC § 1912(d), rather than declare the statute unconstitutionally vague, courts have concluded that Congress intended the "default" standard of clear and convincing evidence to apply to the ICWA's "active efforts" determination. We conclude that the same reasoning applies with equal force in this case.

As set forth above, the relevant provisions of the ICWA and the MIFPA are essentially identical; that is, each requires proof by "clear and convincing evidence" to remove an Indian child and place him or her into foster care, 25 USC § 1912(e), MCL 712B.15(2); proof sufficient to satisfy the trial court that active efforts have been made to terminate parental rights, 25 USC § 1912(d), MCL 712B.15(3); and proof "beyond a reasonable doubt" that continued custody will harm the child, 25 USC § 1912(f); MCL 712B.15(4). Thus, as with its federal counterpart, the Legislature, in enacting the MIFPA, set forth specific evidentiary standards in MCL 712B.15(2) and (4), while declining to do so in MCL 712B.15(3). The inevitable conclusion, therefore, is that, like Congress, the Legislature intended for the "default" evidentiary standard applicable in child protective proceedings—i.e. clear and convincing evidence—to apply to the findings required under MCL 712B.15(3) as to whether "active efforts" were made to prevent the breakup of the Indian family. Accord *In re JL*, 485 Mich at 318-319; *In re Roe*, 281 Mich at 100-101. Therefore, because a default standard of proof applies to MCL 712B.15(3), it is not unconstitutionally vague.

---

[2] As our Supreme Court noted, other states have also applied the clear and convincing standard to active efforts determinations under the ICWA. *In re JL*, 483 Mich at 319 n 13, citing *In re Walter W*, 274 Neb at 864-865, *In re MS*, 2001 ND 86; 624 NW2d 678 (2001), and *In re Michael G*, 63 Cal App 4th 700, 709-712; 74 Cal Rptr 2d 642 (1998). See also *In re Vaughn R*, 320 Wis 2d 652, 680-687; 770 NW2d 795 (2009); *In re Dependency of AM*, 106 Wash App 123, 131-135; 22 P3d 828 (2001); *Doe v Roe*, 127 Idaho 452, 457-458; 902 P2d 477 (1995).

Although it is somewhat unclear as to whether respondent challenges the trial court's "active efforts" determination under MCL 712B.15(3), we conclude that there was no clear error with respect to the trial court's findings in this respect.

The record indicates that Sharma contacted the Tribe at the outset of the proceedings to solicit the Tribe's involvement and further indicated that she maintained regular contact with O'Neill throughout the approximately 11-month duration of these proceedings. In turn, O'Neill kept the Tribe's child welfare committee apprised of respondent's progress throughout the case. Sharma also met with respondent at the outset of the proceedings, while he was in jail, in order to identify respondent's barriers to reunification. Then, upon his release, Sharma met with respondent to develop a service plan that would address respondent's various needs, including employment, housing, anger management, and parenting skills, and tailored the service plan to work in conjunction with respondent's probation requirements. Sharma contacted American Indian Health and Family Services (AIHFS)—which O'Neill identified as a culturally appropriate referral service—to arrange for respondent's participation in counseling and encouraged respondent to contact AIHFS to schedule an intake appointment. Sharma also arranged for respondent to participate in a parenting class and a psychological evaluation.

Throughout the proceedings, Sharma maintained, or attempted to maintain, regular contact with respondent by telephone and by mail and also stayed in touch with respondent's service providers and his probation officer. When respondent expressed that he had not been participating in services, Sharma encouraged him to reconnect with AIHFS and also offered to assist respondent with his transportation needs. Finally, she reviewed the service plan with respondent toward the end of the case to ensure he was aware of his needs and to ask if respondent needed any additional services. O'Neill opined that Sharma had made active efforts to provide remedial services to respondent. Based on this record evidence, there was clear and convincing evidence to conclude that active efforts were made and the trial court did not clearly err in making the requisite findings under MCL 712B.15(3).

### III. FINDINGS UNDER MCL 712B.15(4)

Respondent argues that the trial court clearly erred in finding, beyond a reasonable doubt, that E.M. would be harmed if returned to respondent's care. See 25 USC 1912(f); MCL 712B.15(4); MCR 3.977(G)(2).

As discussed above, respondent caused serious physical harm to E.M. on more than one occasion. Throughout these proceedings, however, he failed to take responsibility for his actions and instead attempted to shift the blame to others and cast himself as the victim. Respondent failed to adequately participate in counseling services or maintain consistent contact with DHHS. At the time of termination, Dr. Ehrlich opined that respondent was a danger to the child and should not be around children. Moreover, based on Dr. Ehrlich's report and the fact that respondent failed to adequately participate in services or take responsibility for his actions, O'Neill, a qualified expert witness, opined that E.M. would be at risk of future harm if returned to respondent's care. Sharma shared this opinion. On this record, the evidence, including the testimony of a qualified expert witness, proved beyond a reasonable doubt that returning E.M. to respondent's care would likely result in serious emotional or physical harm. 25 USC § 1912(f); MCL 712B.15(4); MCR 3.977(G)(2).

In arguing otherwise, respondent essentially attempts to attack O'Neill's qualifications and opinions. We note, however, that respondent did not challenge O'Neill's qualification as an expert at the termination hearing. In any event, given her extensive knowledge and experience, coupled with the fact that she is a member of the Tribe, any challenge to O'Neill's qualification as an expert would have been futile. See MCL 712B.17. Finally, we reject respondent's argument that O'Neill was merely a puppet for the Tribe's child welfare committee. To the contrary, O'Neill expressed her independent expert opinion that E.M. would be subject to future harm if returned to respondent's care and merely elaborated that the Tribe's child welfare committee shared the same opinion. The trial court did not clearly err in considering O'Neill's testimony.

IV. PRELIMINARY INQUIRY

Next, for the first time on appeal, respondent raises several arguments regarding the January 10, 2014 preliminary inquiry, each of which we find to be without merit.

Respondent argues that his statutory and constitutional rights were violated at the preliminary inquiry when the trial court permitted the Tribe to intervene upon an oral motion, without proper notice or service and without first appointing respondent an attorney, and when the trial court subsequently allowed O'Neill to testify without allowing respondent a chance to cross-examine her or to offer his own expert to rebut her testimony. Additionally, he argues that his rights were violated when he was not afforded an opportunity to seek a transfer of jurisdiction to the tribal court. We disagree. We review these unpreserved issues for plain error affecting substantial rights. *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011).

A preliminary inquiry is, by definition, an "informal review" proceeding to determine proper action on a petition. MCR 3.903(A)(23). It is distinguished from a preliminary hearing in that the child is not in the temporary custody of DHHS and there is no request for the child's removal contained in the petition. MCR 3.962(A); MCR 3.965(A)(1); *In re Hatcher*, 443 Mich 426, 434; 505 NW2d 834 (1993). "The permissible actions following a preliminary inquiry are limited to granting or denying authorization to file the petition, or referring the matter to 'alternative services.'" *In re Kyle*, 480 Mich 1151, 1151; 746 NW2d 302 (2008), citing MCR 3.962(B)(1)-(3). Because of its "informal" nature, MCR 3.903(A)(23), and the narrowly tailored purpose for which it serves, MCR 3.962(B), the court rules provide that "[a] preliminary inquiry need not be conducted on the record or in the presence of the parties." MCR 3.962(B).

In this case, given that respondent was not entitled to be present at the January 10, 2014 preliminary inquiry, he was not entitled to the assistance of counsel at such proceeding. Moreover, there is nothing in the court rule governing preliminary inquiries, MCR 3.962, which entitled respondent to any advanced notice of the Tribe's intent to intervene and present testimony. Furthermore, respondent had no right to cross-examine O'Neill at the preliminary inquiry or present his own expert witnesses. Finally, he had no right to seek a transfer of jurisdiction at the preliminary inquiry. Simply put, there was no plain error. In any event, respondent's substantial rights were not affected, inasmuch as it is undisputed that he was represented by counsel throughout the remainder of the proceedings, had a chance to cross-examine O'Neill and present his own witnesses at the termination hearing, and had the opportunity—which he did not utilize—to seek a transfer of jurisdiction.

Finally, respondent argues that the trial court erred in concluding at the preliminary inquiry, pursuant to MCL 712B.15(2), that active efforts were made and that the child would be subject to future harm. This argument lacks merit.

MCL 712B.15(2) provides, in pertinent part, that "a[n] Indian child may be *removed* from a parent or Indian custodian, *placed into a foster care placement*, or, for an Indian child already taken into protective custody, *remain removed* from a parent or Indian custodian . . . only upon clear and convincing evidence . . . that active efforts have been made . . . that the active efforts were unsuccessful, and that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child . . . ." MCL 712B.15(2) (emphasis added). As noted above, this subsection applies only to removal decisions. Here, however, the record makes abundantly clear that E.M. was not removed from the parental home or placed in foster care. Rather, E.M. remained with his mother in the family home throughout these proceedings. Because E.M. was never removed, the trial court was not required to make any findings at the January 10, 2014 preliminary inquiry pursuant to MCL 712B.15(2). Instead, the trial court was only required, as part of its termination order, to make "active efforts" and "risk of harm" findings pursuant to MCL 712B.15(3) and (4). As discussed above, the trial court made those findings and they were not clearly erroneous. There was no error.

## D. CONCLUSIONS

In conclusion, we hold that the trial court did not clearly err in finding grounds for termination and in determining that the termination was in E.M.'s best interests. Additionally, we hold that MCL 712B.15(3) is not unconstitutionally vague where the default clear and convincing evidence standard applies to the findings mandated by that statutory provision; furthermore, we conclude that the trial court did not clearly err in making the findings required under MCL 712B.15(3) and MCL 712B.15(4). Finally, the trial court did not deny respondent his constitutional or statutory rights at the preliminary inquiry.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello